# CASES

ADJUDGED IN

# THE COURT OF CHANCERY

## OF THE STATE OF NEW JERSEY,

### OCTOBER TERM, 1863.

THE DELAWARE AND RARITAN CANAL AND CAMDEN AND
AMBOY RAILROAD AND TRANSPORTATION COMPANIES *vs.*
THE CAMDEN AND ATLANTIC RAILROAD COMPANY, THE
RARITAN AND DELAWARE BAY RAILROAD COMPANY, and
others.

1. The restraining power of a court of equity is exercised for the protection of rights, the existence of which are clearly established, and so far only as may be essential for the protection of those rights.

2. The phraseology of the clause under which the exclusive privileges are claimed by the complainants, "it shall not be lawful, &c.," (*Pamph. L.* 1832, *p.* 80,) is the form in which the faith of the state is usually pledged, and in which contracts with corporations, touching the exercise of exclusive franchises under legislative authority, are entered into. It is none the less obligatory that it is not in *form* a contract.

3. The legislature cannot divest itself or its successors, of its sovereignty, or extinguish the trusts committed to its custody for the public welfare. It not only may, but must determine in what manner that sovereignty shall be exercised, and how those trusts shall be executed.

4. By the grant of exclusive privileges to the joint companies, the legislature in no proper sense derogated from the power of subsequent legislatures to provide highways. The legislature have the same control over their franchises and property as over those of any other citizens, and they may be taken and condemned for public use upon making just compensation.

Del. & Rar. Canal and C. & A. R. & T. Co. *v.* Rar. & Del. Bay R. Co. et al.

5. The clause in the charter of incorporation, rendering the *consent of the companies necessary* to legalize the construction of a competing road, cannot affect the validity of the law as an act of legislation. Their *assent* is no part of legislation. It does not create the law, but merely avoids the constitutional objection to its validity.

6. An engagement by a contracting party that he will not do any act to the prejudice of the other contracting party, without his consent, is, in effect, identical with an absolute and unqualified engagement not to do the act:

7. By the act of 1854 (*Pamph. L.* 388,) supplementary to the act entitled "an act relative to the Delaware and Raritan Canal and Camden and Amboy Railroad and Transportation Companies," the true intent and meaning of the said last mentioned act, are declared to be "fully and effectually to protect, until the first day of January, 1869, the business of the said joint companies from railroad competition between the cities of New York and Philadelphia."

*Held*, the grant of this exclusive privilege operates only to protect the through business *from city to city*, and not between intermediate places and over any and every part of the route between the said cities. The franchise is *exclusive* only in regard to passengers and merchandise transported over the entire route.

8. But even if the exclusive privilege also extend to way business, still a competing route for local business is not a nuisance, unless so near the route of the complainant's road as *materially* to affect or take away its custom.

9. It is a well settled rule of construction that public grants are to be construed strictly; and in all cases of grants of franchises by the public to a private corporation, the established rule of construction is that any ambiguity in the terms of the contract must operate against the corporation, in favor of the public. The corporation take nothing that is not clearly given by the act.

10. Parties cannot affect by combination what neither can do lawfully. Nor can they affect by the agency of others, what they may not do themselves.

11. An injunction is the proper remedy to secure to a party the enjoyment of a statute privilege, of which he is in the actual possession, and when his legal title is not put in doubt.

12. If a corporation goes beyond the powers with which the legislature has invested them, and in a mistaken exercise of those powers interferes with the rights or property of others, equity is bound to interfere by injunction if the exigency of the case require it. Whether those rights are invaded by a mistaken or a fraudulent exercise of power is immaterial.

13. The legislature cannot be presumed by a charter to intend or contemplate any grant inconsistent with, or that would operate as an invasion of, a grant already made.

Del. & Rar. Canal and C. & A. R. & T. Co. v. Rar. & Del. Bay R. Co. et al.

14. The powers of a court of equity in regard to nuisances, are correct-ive as well as preventive. It may order them to be abated, as well as restrain them from being constructed. As a general rule, such relief will not be granted unless made the subject of a special prayer.

15. To justify the issuing of an injunction to restrain the erection of a nuisance, or to abate it after it is erected, it must appear not only that the complainant's rights are clear, but that the thing sought to be enjoined is prejudicial to those rights. The fact of the nuisance must be clearly es-tablished.

16. A structure, though illegal, will not be enjoined as a nuisance, where it occasions no injury to the rights of the complainant.

17. The closing of a road used as a highway for travel, by injunction, can only be justified by the clearest necessity.

This cause was originally argued upon a motion for a pre-liminary injunction upon bill, answers, and affidavits.

On the 12th of August, 1862, the preliminary injunction was refused upon grounds then succinctly stated by the Chancellor.* No further proceedings were had in the cause until the 9th of June, 1863, when leave was given to the complainants to file their replication to the answers of the defendants to the original bill, and also to file a supplemental bill. On the 10th of June, 1863, the complainants filed their supplemental bill, by which, after setting out the sub-stance of the original bill, the answers of the defendants, the taking of affidavits, and the denial of the preliminary in-junction, they proceed by way of supplement, as follows:

And your orators by way of supplement show unto your honor, that notwithstanding the said declaration of the de-fendants in their said several answers, your orators have been informed and believe it to be true that, since the filing of the said answers and since the said hearing before your honor, the said defendants, the Raritan and Delaware Bay Railroad Company have completed their railroad from Port Monmouth to Atsion aforesaid, and, in combination with the Camden and Atlantic Railroad Company, have completed the said branch railroad from Atsion to the Camden and Atlantic

* 2 McCarter 19.

Railroad near Jackson aforesaid, and by means of the said branch have connected the said railroads so as to form a convenient and continuous line of railway from Camden to Port Monmouth; and have made arrangements, by contract of some sort, for continuing said line by means of steamboats between Port Monmouth and the city of New York, and between Camden and Philadelphia, so as to form a complete line of travel and transportation over the said line of railroad between the said cities of New York and Philadelphia; and, in violation of their pledges, thus given as aforesaid to this honorable court in their said answers, have actually established lines of transportation, both of freight and passengers, between the said cities, over and by means of said line of railway and said steamboats—in continuation thereof—and are now actually engaged in such transportation, in open and direct violation of your orator's said chartered rights and privileges before referred to.

And your orators further show unto your honor, that they are informed and believe it to be true, that in carrying on the said business of transporting merchandise between the cities of New York and Philadelphia, the said defendants are using, and combining with other parties to use, certain names of designation for the said line of transportation, one of which names is the Importers' and Traders' Dispatch Company, under which name they keep regular offices for the reception and delivery of freight by said line at No. 2 Murray street, in the city of New York, and at pier No. 28 North river, in said city, and at Vine street wharf, in the city of Philadelphia; from which offices goods are regularly shipped over and by means of the said line of the defendants between the cities of New York and Philadelphia; and another of which names is the Union Transportation Company, under which name they keep regular offices for receiving and delivering freight at No. 136 North wharves, in the city of Philadelphia, and at pier No. 28 North river, in the city of New York, from which offices goods are regularly shipped over and by means of the said line of the defendants, between the said cities of

New York and Philadelphia; and another of which names is the Philadelphia and Eastern Transportation Company, under which name offices are kept in said cities, and goods are regularly transported between New York and Philadelphia over and by means of the said line of the defendants. And your orators are informed and believe that by this means, and under the aforesaid names and designations, the defendants and their confederates are carrying on a large freighting and transportation business between the cities of New York and Philadelphia, over and by means of the said railroad line between Camden and Port Monmouth, and the steamboats running in regular connection therewith at either extremity of said line, amounting to more than one hundred tons of transportation per day in each direction. And your orators are also informed, and believe it to be true, that the said Raritan and Delaware Bay Railroad Company, in order to cover up and conceal the real nature of the said transportation business, have made and entered into a certain pretended contract with certain persons under the name of the said the Philadelphia and Eastern Transportation Company, for the transportation of freight for said company between Camden and Port Monmouth, on certain terms in said agreement contained; and that the said railroad company pretends to be engaged in the said transportation business under and by virtue of the said agreement, and only between the said places last named; but if any such pretence shall be made by the said railroad company, and if any such contract shall be shown to have been made and entered into, your orators charge that such agreement was made with full knowledge on the part of the said Raritan and Delaware Bay Railroad Company, its officers and agents, that the business to be carried on under such agreement was to be, and was intended and understood to be, a through business between the said cities of New York and Philadelphia, or mainly such; and was also made in view of, and in connection with other arrangements or agreements for the employment of a steamboat or boats to continue and complete the said line between Port

Monmouth and New York, and between Camden and Phila-delphia; and your orators charge that such steamboat or steamboats was or were the property of the officers and managers of the said railroad company, or some of them, or that they, or some of them, had a large and controlling interest therein.   And your orators also charge that if any such agreement or agreements was or were made, it was made under and with the express understanding that, if the said business should be interrupted or prevented by means of legal proceedings instituted in the behalf of your orators or other-wise, neither of the parties to such agreement should be liable to the other for any damages by reason thereof, and should have the privilege of abandoning the same, or some other pro-vision with that or the like effect.   And your orators expressly charge that any such agreement or contract which the said corporate defendants or either of them may have entered into, in relation to the transportation of goods between Camden and Port Monmouth, was entered into by them in contem-plation of and with direct reference to the employment of steamboats at either end of said line, to complete the same as a line of transportation between the cities of New York and Philadelphia, and in contemplation, and with the intent of forming a through line of transportation between said cities for the transportation of goods from city to city, between the said cities, in direct contravention of the acknowledged rights and privileges of your orators.

And your orators further show unto your honor, that if the said corporate defendants should pretend that the said trans-portation business is carried on by other persons than them-selves over their line of railroad, your orators charge that if such be the case, it is nevertheless so done by the consent and co-operation of the said corporate defendants, and in virtue of arrangements and agreements by them made with such other persons; and the said corporate defendants are re-sponsible therefor, inasmuch as by their own showing, in and by the said answer of the Raritan and Delaware Bay Railroad Company, the said Raritan and Delaware Bay Railroad is not

a public highway, and cannot be operated without the consent, and only under the direction of the said Raritan and Delaware Bay Railroad Company; and your orators further charge that whether the said line of transportation is carried on directly by the said corporate defendants or one of them, or by other persons under contract with them, such other persons are and must be deemed as the agents of the said corporate defendants or one of them, in carrying on said business of transportation; and your orators charge that the said corporate defendants, and also the said other persons who are aiding and assisting in carrying on the said business, are liable and chargeable therefor in the same manner and to the same extent as if the said other persons were the agents of the said corporate defendants therein, whether they are acting under a pretended contract with the said corporate defendants for the use of their railroads, or not. And your orators allege that any such contractors, if any such there be, became such with full knowledge of your orators' rights and privileges, and of the pendency of this suit, and of the allegations of the respective parties therein; and are bound by all the equities which affect the defendants or any of them.

And your orators further show and charge, that one or more steamboats regularly ply between New York and Port Monmouth, in connection with the defendants' trains of cars running between Port Monmouth and Camden, and also one other steamboat or boats ply as ferry boats between Camden and Philadelphia, in connection with the same train of cars, so as to form regular lines of transportation for freight and passengers in both directions, and daily carrying freight and passengers through from New York to Philadelphia and from Philadelphia to New York; and your orators charge that the said steamboats thus ply in connection with said trains of cars by the procurement of the corporate defendants or one of them; but whether they do or not so ply by such procurement, the said corporate defendants are aiding and contributing, by such use of their line of railroad between Port Monmouth and Camden in connection with said boats, in

establishing and carrying on a through line of transportation for freight and passengers between the said cities of New York and Philadelphia; and are thus violating the rights and privileges of your orators, and the pledges of the said defendants.

And your orators further show and charge that the said corporate defendants, in connection with their said confederates, are also engaged in the way-business by means of said line; whereby they largely compete with the railroad business of your orators, in violation of your orators' said rights and privileges, especially in the transportation by the said defendants of freight and passengers between Camden and New York, and between Philadelphia and Port Monmouth, and also between Philadelphia and Long Branch, on and over the said line of transportation so established by them as aforesaid.

And your orators further show and charge that, in carrying on their said through business, the said defendants and their confederates give carriers' tickets for freight through from city to city, between the said cities of New York and Philadelphia; but in regard to through passengers, they use various devices to avoid the appearance of ticketing a passenger through from city to city, such as requiring such passenger to pay a separate fare on the steamboat between Port Monmouth and New York, and the like; nevertheless, they do issue tickets for fare through between Camden and New York, and between Philadelphia and Port Monmouth; but notwithstanding these and such like devices, it is a well understood thing with the through passengers, that an arrangement exists by which they can go through by the entire line from one city to the other, without interruption or detention, as through passengers. And your orators charge that such arrangements are mere subterfuges to avoid, as far as possible, the appearance of open violation of your orators' rights and privileges before referred to, at the same time that the said defendants are, in law and in fact, guilty of such violation.

And your orators state and show to your honor, that the said defendants, by thus establishing and carrying on the said line of transportation on the said railroad, and the transportation of passengers and merchandise thereby, whether by themselves or through their agents or contractors, and whether singly as sole proprietors of the entire line, or jointly in connection with other parties owning the said steamboats at either end thereof, are guilty of a direct and gross violation of the rights and privileges guaranteed to your orators in and by the second section of the act passed the second day of March, in the year eighteen hundred and thirty-two, set forth in the said original bill and herein above referred to, and in and by the first section of the act approved on the sixteenth day of March, in the year eighteen hundred and fifty-four, set forth in the said original bill (but by mistake described as approved on the fourteenth day of March, in the year aforesaid) and herein above referred to; and a violation of the pledge given to this honorable court in and by their said answers to the said original bill.

And your orators well hoped that the said defendants, after the early and prompt notice given to them of the intention of your orators to vindicate their said rights by the filing of the said original bill before the completion of their line of railroad by way of Jackson and Atsion, notwithstanding their denial of the rights of your orators to the full extent to which your orators claimed the same in said bill, would at least have regarded and respected the rights claimed by your orators, which the said defendants, in and by their said several answers, admitted and acknowledged had been guaranteed to your orators on the part of the state of New Jersey, and which, in and by their said answers, they declared their intention to observe and respect; and your orators also well hoped that the defendants, on further advisement, would have respected and observed all the said rights and privileges claimed by your orators under and by virtue of the said acts of the legislature; especially inasmuch as (which your orators charge the fact to be) the said defendants, in the month of

2 E*

January or February last, appeared by their counsel before a committee of the House of Representatives of the United States, and applied for an act of the Congress of the United States that should create the said railroad line of the defendants from Port Monmouth to Camden, including the ferry between Camden and Philadelphia, and the steamboat route between Port Monmouth and New York, a post road and public highway of the United States, on the express ground alleged by the said counsel, that the said route could not, under the laws of New Jersey, be used for through travel or transportation; and that any attempt so to use the same would be enjoined by the courts of New Jersey; and they desired the said act of congress to enable them to disregard the legislation of New Jersey in this behalf.

But now so it is, may it please your honor, that the said corporate defendants, combining and confederating with the said individual defendants, who are aiding and abetting them in the premises, and with divers other persons at present unknown to your orators, but whose names when discovered your orators pray may be inserted herein and they made parties hereto, with proper and apt words to charge them, and contriving how to injure and aggrieve your orators in the premises, not only refuse so to observe your orators' just rights and privileges guaranteed to them as aforesaid, by contract with the state of New Jersey, but, having failed to obtain an act of congress as applied for by them, or any act of congress on the subject, (which, if obtained, your orators allege would have been ineffectual for the purposes of the defendants) they, the said defendants, and their confederates proceeded to engage in and carry on said business of transportation in defiance of your orators' said rights and privileges, and at the risk of being enjoined and restrained by this honorable court; but in the use and employment of various devices and contrivances before mentioned, and making various pretences, calculated and intended to cover up and conceal the real character of their said acts, and to make it appear that they were not infringing your orators'

said rights and privileges; but either were engaged only in the alleged legitimate business of transporting freight and passengers from one interior point of New Jersey to another interior point thereof; or were permitting other and outside parties, over whom they had no control, namely, their said unknown confederates, to use their road at the alone risk and on the alone responsibility of said other and outside parties; and amongst other things, the said corporate defendants sometimes pretend to have entered into contract or contracts with the said other confederates, who, they pretend, have thereby contracted for the use of their said line of railroad from Camden to Port Monmouth, and for carrying on the said transportation business independently of said defendants; but your orators charge that if any such contract or contracts is, or are made, the same do not and cannot exonerate the defendants from their duty to regard the laws of New Jersey, and the rights of your orators under the same, and under the said guarantees before referred to; nor from so managing and controlling their works as to prevent the violation of said rights. At other times the defendants pretend that they are not, nor is either of them, the proprietor or proprietors of the steamboat or boats by which their said line is connected with, and completed to New York city, nor of the ferry boat or boats by which their said line is connected with, and completed to Philadelphia. But your orators charge that if the defendants, or some of them, are not the owners of said boats, they have, nevertheless, either by themselves, or by their agents or contractors and confederates, in some manner secured the use and employment of said steamboats so as to complete the said line from Philadelphia to New York. At other times the defendants pretend that they only transport passengers and freight to and from way stations, that is, intermediate stations in New Jersey, in connection with the cities of New York and Philadelphia respectively; and do not transport either passengers or freight through the whole route from city to city, and that they are not responsible for the manner in which the said passengers

dispose of themselves, or in which the said freight is disposed of, beyond such intermediate points. But your orators charge that, even if such pretence were true, such way business, or much of it, competes with the business of your orators on their said railroads, contrary to the said acts of eighteen hundred and thirty-two, and eighteen hundred and fifty-four, before referred to; but in truth and in fact, the said defendants, by themselves, their agents, or contractors, do actually transport freight and passengers through the whole of said line or route from Philadelphia to New York, and *vice versa* from New York to Philadelphia; or, if in point of form they do not themselves transport such freight and passengers throughout the whole of said line, they do so in substance and effect; and they do in form, as well as in substance and effect, knowingly participate in carrying on and keeping in operation the said through line as a through line of transportation, and although it were true that other parties sustained and kept in operation portions of said line, yet if the defendants sustained and kept up only a single portion thereof (the same being a known through line), the defendants are responsible for the part they take in the same, as for aiding and contributing in the transportation of passengers and freight directly from city to city, by a railroad constructed for that purpose by the defendants, in violation of the acknowledged rights and privileges of your orators.

And your orators further charge that, if the said business of transporting passengers and freight through from city to city between the said cities of New York and Philadelphia, is conducted, managed, or carried on by the confederates of the said defendants, or of any of them, by virtue of any contract or contracts made by and between them and the said defendants, nevertheless the said defendants, at the time of the making of such contract or contracts, well knew that the said confederates obtaining such contract or contracts, at the time of the making thereof, contemplated and intended to establish and carry on such through lines of transportation from city to city, and by entering into such contract or con-

tracts with the said confederates, the defendants so contracting, knowingly and wilfully co-operated with them in the establishment of such line or lines; and your orators charge, that the said confederates, at the same time, also well knew of the rights of your orators, and of the pending of this suit, and took no rights or interests, by virtue of such contract or contracts, which placed them in any better position, or on any better footing than the said defendants occupied in relation thereto; and that the said contracts were intended merely as a cover to enable the said defendants to carry on the said transportation business ostensibly in the names of other persons, and as a means of deceiving and defrauding your orators in the premises. And your orators charge that all the said contracts and contrivances (if any such were made) were a fraud upon your orators, and intended for the purpose of enabling the defendants to evade your orators' said rights and privileges, and their own obligations in that behalf.

The prayer of the bill is that the said defendants may discover and set forth whether their said line of railroad communication has not been completed from Camden to Port Monmouth by way of Jackson and Atsion, as specified in the former pleadings in this cause; and whether said line has not been furnished with locomotive engines and cars for the transportation of passengers and freight; and whether the same has not been put in operation, and is not now in operation in the transportation of passengers and merchandise thereon; and whether a through line of transportation, both of passengers and freight, or one or the other, and which of them, from city to city, between the cities of New York and Philadelphia, has not been established over said railroad, and whether such line is not now in operation, and actually used in transporting passengers and freight through from city to city as aforesaid; and whether the said line is not conducted and carried on by the defendants, or some or one and which of them; and if not, then by whom else, and under or in pursuance of what arrangement, understanding, or agreement

with the defendants, or some or one and which of them, setting forth the contents in full of any such agreement, if any there may be; or, if there be no through line between the said cities established and carried on by any one party or association of persons, then that they may discover and set forth the different parties or persons who maintain and carry on the several parts and portions of said line, and under what understanding or agreement the same is carried on in separate parts or portions by the several parties interested or concerned therein; and more particularly what interest the defendants, or any of them, may have in the said several portions of said line, or any or either of the said portions, whether as proprietors, lessors, lessees, contractors, contractees, or otherwise; and if there be no professed through line of transportation of passengers or freight from city to city as aforesaid, then to discover whether there is not, nevertheless, an actual line by which passengers and freight, or the one or the other, are in fact transported from city to city as aforesaid, by the transfer of such passengers or freight from one carrier to another, or in some other and what manner; and that the defendants may discover what number of passengers, and what amount of freight have respectively been transported on the said route from city to city as aforesaid; and about what number of passengers and what amount of freight are now being transported daily or weekly from city to city, at this present time; and under what designations or names the said transportation is being carried on; and what rates of fare and freight are charged for such transportation; and that the said defendants may set forth and discover all and every agreement and agreements by them, or any of them, made with any other person or persons, for the transportation of passengers or freight across said line of railroad, giving the names of the persons with whom such agreements may respectively have been made, and setting forth the said agreements in full.

And that the said defendants and each and every of them, and their confederates, contractors, agents, and servants,

may be decreed to desist and refrain from further transporting, or aiding or assisting in the transportation of passengers or merchandise from city to city, between the cities of New York and Philadelphia; and that the said defendants, the Raritan and Delaware Bay Railroad Company and the Camden and Atlantic Railroad Company, and their confederates, contractors, and agents, may be severally decreed to desist and refrain from further permitting or allowing their respective railroads, engines, cars, or machinery, to be used for the purpose of carrying on any such transportation of passengers or merchandise from city to city, between the said cities, or for the purpose of aiding or assisting in the transportation of passengers or merchandise between the said cities from city to city; and that any agreements or arrangements made by them, or either of them, for that purpose, may be declared null and void; and that the said corporation defendants, their confederates, contractors, and agents, may be severally decreed to desist and refrain from forwarding, and from aiding or assisting to forward, and from permitting or allowing to be forwarded, by way of the said railroad or any part thereof, from any point or place in this state to any other point or place in this state, any passengers or merchandise which are or may be in the course of transportation from city to city, between the said cities of New York and Philadelphia; and that all the said other defendants may be severally decreed to desist and refrain from aiding and abetting the said corporate defendants, or either of them, in any such forwarding of freight or merchandise; and that by the decree of this honorable court, the defendants and each of them, together with their confederates, contractors, and agents, may be enjoined, restrained, and prohibited from doing any act or acts for, or towards, or in aid of the transportation of passengers or merchandise between New York and Philadelphia, by way of said railroad, either by using or permitting to be used the different sections thereof for that purpose, in connection with each other, or by using the said railroad or any part thereof in connec-

Del. & Rar. Canal and C. & A. R. & T. Co. *v.* Rar. & Del. Bay R. Co. et al.

tion with any steamboat or steamboats; and that the said corporation defendants may be restrained and prohibited from permitting their respective roads, or any section or sections thereof, to be used for any such last mentioned purpose; and that said defendants, respectively, and their confederates, respectively, may be enjoined and restrained from performing, aiding, or contributing to the transportation of passengers or freight from city to city aforesaid, across the said railroad, and upon steamboats running in connection therewith, by any other device or contrivance whatsoever; and that the said defendants may be severally enjoined and restrained from using the said railroad between Camden and Port Monmouth in any other manner, so as to compete in business with the railroads of your orators; and that the said corporation defendants may pay to your orators all such damages as your orators may have sustained by their unlawful acts in the premises, and that an account may be taken to ascertain the amount of said damages; and that your orators may have such other or further relief as to your honor shall seem meet, and shall be agreeable to equity and good conscience.

Affidavits and exhibits were annexed to the bill in support of its material charges. Answers were filed by all the defendants. Depositions having been taken, the cause is now heard upon the pleadings and proofs.

*J. P. Stockton,* for the complainants.

· I shall assume as settled, the points assumed upon the former hearing, and which I do not consider as open.

1. That there is an existing and valid contract between the complainants and the state.

2. That the complainants have not, by consent, relinquished any of the rights secured by said contract.

3. That this court has jurisdiction, and is the proper tribunal to protect the complainants in the enjoyment of their franchises.

Del. & Rar. Canal and C. & A. R. & T. Co. v. Rar. & Del. Bay R. Co. et al.

If the complainants are seeking their rights in a proper manner by the supplemental bill, our inquiry will be confined to three points.

1. The nature and extent of complainants' franchise.

2. The fact and the manner of their disturbance.

3. The nature and kind of relief to which they are entitled.

As preliminary, I insist the complainants are properly in court by their supplemental bill. It states new facts, and asks additional relief.

The great fact charged in the original bill is, that the Raritan and Delaware Bay Railroad was being constructed to be used in violation of the chartered rights of the complainants, as a means of transportation.

The answer denied any intention to violate our rights. The defendants went further, and alleged that the road was not a public highway, and could not be used by other parties, without their consent, to violate our rights.

By our supplemental bill and proofs, we establish the fact that freight and merchandise have been carried over the roads between the cities. We ask, therefore, not only the specific relief prayed for in the supplemental bill, but such general relief as we may be entitled to.

A supplemental bill is the proper mode of bringing before the court the whole ground of complaint, and to obtain the assistance of the court, either to aid the complainants in obtaining the relief sought by the original bill, or new and additional relief. *Story's Eq. Pl.,* § 336; *Candler* v. *Pettit,* 1 *Paige* 168; 2 *Mad.* 405; *Edgar* v. *Clevenger,* 2 *Green's Ch. R.* 259, 464; *S. C.* 1 *Ibid.* 261; *Jones* v. *Jones,* 3 *Atk.* 217.

I. The nature and extent of the complainants' franchise.

The view of the Chancellor upon this point will be found in the tenth point of his opinion delivered on the former argument. 2 *McCarter* 21.

But I insist that the essential element of a competing business is a railway used for the transportation of m[...]-

chandise across the state. It is a railroad or roads, and not the line of communication. It is a railroad within and across the state of New Jersey. It is a road or roads used for the purpose of transportation between the cities, not extending from city to city, but any portion of the distance between them.

The only condition to be fulfilled to bring a road within the prohibition is, that it should be used in the through transportation, no matter how it may be so employed. *Boston and Lowell R. Co.* v. *Salem and Lowell R. Co.*, 2 *Gray* 4; *Pontchartrain R. Co.* v. *New Orleans and Carrollton R. Co.*, 11 *Louisana R.* 254; *Act of 4th Feb.*, 1830, § 2, 11, 16, 23.

All that the statute could prohibit or protect was the railway across the state. They mean from water to water; that is all they could mean. The railway is declared a public highway. The grant is of a road across the state. The prohibition is of roads to compete with that. *Charter of Canal Co.* (*Laws of* 1830, *p.* 73, 83,) § 2, 11; *Act of Feb. 3d,* 1831, § 2; *Act of 2d March*, 1832, § 2; *Act of* 1830, § 24; *Act of* 1831, § 7; *Richmond R. Co.* v. *The Louisa R. Co.*, 13 *How.* 85, dissenting opinion of Curtis, J.; *Colledge* v. *Harty*, 6 *Welsby, Hurlst. & G.* 205.

The object of the legislature was to protect the company from railroad competition. By the act of 1854, the intent of all previous acts and legislation of the state is declared to be fully and effectually to protect the business of the companies from railroad competition between New York and Philadelphia. *Act of* 1854, § 4; *Act of* 1830, § 7, 24.

II. The fact and manner of the disturbance of the franchise.

1. The defendants' road has been used, by their own admission, to transport soldiers, horses, and munitions of war. The fact that it was done by order of the secretary of war, makes it no less a violation of our franchise.

2. The affidavits annexed to the supplemental bill and the admission of the answer, show that.there is in existence a line or lines of transportation, both for freight and passengers, between Philadelphia and New York, by means of the

defendants' road. And that the road is used for the transportation of passengers and freight "between the cities by railway" across the state, in whatever sense those words may be used.

3. They admit that the Philadelphia and Eastern Transportation Company have an office in the city, and carry on the business of transportation between the cities, and that they are responsible for the acts of which we complain.

4. They admit that they are directly disturbing our franchise by transporting from Camden and from Philadelphia to Port Monmouth, and from Camden to New York; and this line carries the passengers and freight over the roads between the cities.

It matters not by whose order the wrongful act was done. It is not alleged that the government have taken military possession of the road; if it were so, it would be no excuse for a third party, nor relieve them from responsibility for the violation of our rights. The government has no power, by making it a post or military road, to affect our franchise. *Shrewsbury and Birm. R. Co.* v. *The London and N. W. R. Co.*, 17 *Adol. & Ellis* (*N. S.*), 669, 670.

The pleadings and evidence clearly show a direct violation of our franchise, and that the junction of the two roads was effected with that very object in view.

But it is said—

1. That it is not a competing business.

2. That the business is so insignificant as not to entitle us to the interference of the court.

The maxim " *de minimis non curat lex*" never applies to the positive and wrongful invasion of one's property. Every injury to a legal right is a wrong. *Seneca Road Co.* v. *Auburn R. Co.*, 5 *Hill* 170, 175; *Broom's Leg. Max.* 152, 155; *Penruddock's case*, 5 *Rep.* 101, *b*; *King* v. *The Rochdale Co.*, 14 *Adol. & Ellis* (*N. S.*), 136; *Washburn on Easements*, 219, 229, 569; 2 *Mach. & Gor.* 243; *Webb* v. *The Portland Manuf'g Co.*, 3 *Sumn.* 189, 197.

The defendants are answerable for the illegal use of their

road made by others, because they have themselves declared that their road was not a public highway, and could not be used. by others without their consent. *Rex.* v. *Medley*, 6 *Carr. & Payne* 292; *Brice* v. *Dorr*, 3 *McLean* 583; *Story's Ex'rs* v. *Holcombe*, 4 *McLean* 310; *Hogg* v. *Emerson*, 11 *How.* 607.

If they had leased both the roads, they are liable for any injury done by their lessees. *Millington* v. *Fox*, 3 *Mylne & C.* 338, 353.

They have constituted the transportation company their agents to carry on this business, and are, therefore, liable to us. *Story on Agency* 452; *Smith's Master and Servant* 132, 154.

They cannot do indirectly, or by circuitous contrivance, what they cannot do directly. *York and Maryland Line R. Co.* v. *Winans*, 17 *How.* 30.

They cannot escape liability except by an act of the legis-- lature. 7 *Clark & Finnelly* 509; *Huzzy* v. *Field*, 2 *Cromp. Mees. & Ros.* 442; *Chapman* v. *The Mad River and L. E. R. Co.*, 6 *Ohio State R.* 120; *Robbins* v. *Hardcastle*, 2 *Durnf. & East* 252.

As to the effect of the lease. 13 *Gray* 128; 46 *Maine* 117; 44 *Maine* 362; 26 *Vt.* 717; 27 *Vt.* 370; *Redfield on Railways* 436.

If the wrongful acts of the defendants are tolerated, the state as well as the complainants are injured. We are mere *termors;* the state has the reversion. We should be answer-able to the state for permitting destruction of the property. We are trustees, bound to protect *cestui que trusts.* *Shaw* v. *Norfolk R. Co.*, 5 *Gray* 170; 3 *Young & Coll.* 216; *Red-field on Railways* 494, 411, § 179; 1 *Stockt.* 507.

If a railroad has been constructed and used, which has carried passengers and freight which would otherwise have sought the complainants' road, or if they have advertised a through route, and a single passenger or ton of merchan-dise has been carried over that route, they have violated our

franchise.   4 *Comyn's Dig.* "*Piscary,*" *B;* 2 *Beas.* 94, 96;
*Huzzey* v. *Field,* 2 *Cromp. Mees. & Ros.* 442.

There is no lawful purpose to which the road can be put.
They have exceeded their powers.   The road was illegally
and fraudulently located.   9 *Harris* 126.   The answers of
both parties avow that they deviated from the route desig-
nated by the legislature to reach the city of Philadelphia.
They are mere trespassers, acting without legal authority in
the construction of their road.   *Chamberlaine* v. *Chester R.
Co.,* 1 *Welsby, Hurlst. & G.* 876, 877.

III. As to the relief to which the complainants are enti-
tled, we ask that the nuisance be abated.   It exists against
law and by fraud practised on the court.   The court will
order it abated, or by mandatory injunction forbid it to be
continued.

The court, on the former hearing, refused to enjoin the *con-
struction* of the road, on the ground that the answers of the
defendants expressly denied their intention to violate the
chartered rights of the complainants.   The evidence shows,
notwithstanding that the road has been used in such viola-
tion, and that such was the intention of the defendants.
This conduct has been a contempt of justice and an affront
to the court.

The court will use its power most vigorously for the vin-
dication of the complainants' rights.   *Earl* v. *DeHart,* 1
*Beas.* 287;   *Washburn on Easements* 578.

The court may abate as well as prevent nuisances, in clear
cases.   *Drewry on Inj.* 176-7, 260; 2 *Atk.* 83.

At the former hearing we were clearly entitled to an in-
junction to prevent the *construction* of the road, if it was
intended to be used to our injury; if we had that right then,
we have now the right to abate it.   The court is bound to
see that the defendants do not profit by their own wrong.
*Croton Turnpike Road* v. *Ryder,* 1 *Johns. Ch. R.* 611.

We were, on filing the bill, entitled to prevent the con-
struction of the road as the means of protection against its
use.   *Atkyns* v. *Kinnier,* 4 *Excheq.* 776; *Dendy* v. *Hender-*

2 F *

son, 11 *Excheq.* 192; *Tallis* v. *Tallis*, 1 *Ellis & Black.* 391; *Whittemore* v. *Cutter*, 1 *Gall.* 429; *Hall* v. *Bainbridge*, 5 *Adol. & Ellis*, (*N. S.*), 233.

*Williamson*, for the Raritan and Delaware Bay Railroad Company.

No great pecuniary interest is involved in the immediate result. The contest is mainly for principle.

The bill claims not only a right to the through business, but also to the intermediate business between the cities.

1. The defendants deny the grant of such rights as are claimed by the bill.

2. They insist that such grant, if made, is unconstitutional.

3. The prohibition extends to the *use* only, not to the construction of the road.

4. The location of the defendants' road was, by their charter, referred to the discretion of the directors, and cannot be interfered with.

5. The complainants had acquiesced in the action of the defendants, and were too late in their application for relief.

The court have already decided that the prohibition extends to the *use* only, and not to the construction of the road. As a corollary of that proposition, we insist—

1. That the construction of those roads, and the transportation of passengers over them, do not necessarily constitute any violation of the complainants' rights.

2. That the injunction ought not to be granted, merely because the road may be perverted to an illegal use.

3. That full protection can be given to the complainants' rights by an injunction restraining the *use* of the road.

The great object of the original bill was to restrain the *use* only. The complainants now ask more. They seek the utter destruction of the road. The original bill was filed in July, 1862. The defendants commenced running their road in August, 1862. The complainants stopped proceedings until the 9th of June, 1863, and now in December, 1863,

seventeen months after the filing of the original bill, they seek the destruction of the defendants' road.

The object of the supplemental bill was to bring before the court facts which had occurred since the filing of the original bill. There is no further proof as to any fact in the original bill; it is confined to matter in the supplemental bill.

No one, on reading the bill or supplemental bill, would imagine that the claim of the complainants extended to local business. In the prayer of the bill, local business is not alluded to.

As to the effect of the word "between," in the charter of the complainants, it may mean either the entire distance from city to city, or any portion of said distance. 13 *How.* 80, 83, 85. We must give to it the interpretation which the legislature intended. Counsel, themselves, give different meaning to the word in different parts of the original and supplemental bills. The legislature have attached different meanings to it. *Act of* 1831, § 3; *Act of* 1837, § 3; *Act of* 1842.

It is urged that the appropriate redress is by destroying our road. Such relief could only be asked on the assumption that their construction of the law is right.

If the construction of the road is legal, it is not a nuisance.

In attempting to abate a nuisance, the court will not needlessly do injury to any one. All that will be done will be to give the complainants the relief to which they are clearly entitled, without needlessly prejudicing the interests of the defendants.

If the directors of the defendant corporations have sworn false, why should the property of the stockholders be sacrificed?

As to the extent of remedy. 9 *Paige* 575; 1 *Ibid.* 197; 1 *Gall.* 429.

But it is urged that the court should destroy the road by way of abating the nuisance, because the defendants have fraudulently located their road, not only in violation of the charter, but for the express purpose of violating the com-

plainants' chartered rights. The complaint is that the road is not located on a direct line. The answer avers that the deviation is only a distance of four miles from a straight line between the beginning and ending points. The cases upon this point were cited upon the former argument.

The defendants admit that they approached the city of Philadelphia as near as they could consistently with their charter. The charge of fraud is utterly denied. As early as the 18th of March, 1861, they gave the complainants distinct notice of their intention. No attempt was made to interfere with the operations of the defendants until July, 1862. A party cannot lie by and permit another to expend his money on a great enterprise, and then invoke the power of the court for its destruction.

Nor can the complainants complain of the mislocation of the road. If wrong is done, let the state complain.

We have the answers of all the defendants, clear and explicit, that they selected the best route for the road authorized in their charter, so far as the character of the ground is concerned.

But suppose the road to be improperly located, how much of it is to be demolished? Will the court say where the road is to be built; where the point of intersection of the two roads shall be? Why did not complainants show where the road ought to be located, or what better point of intersection could be selected? No such remedy as is now asked for, has been granted in any of the cases cited and relied upon.

As to the character and extent of the complainants' rights.

The complainants insist that carrying a single passenger or a ton of merchandise on any portion of these roads, is a violation of their franchise.

We insist that all the complainants are entitled to, is protection from competition in the transportation of merchandise from city to city. *Act of Feb. 4th*, 1830, § 24. The language of this act admits of no doubt. *Act of Feb. 3d*, 1831, § 2, *supplement to Canal act; act of Feb.* 4, 1831, § 6,

7, *supplement to Railroad charter.* Thus far specific protection is given. Nothing is said of competition.

The act of March 2d, 1832, § 2, first uses the word *compete.* The phrase is, " which shall be intended or used for the transportation of passengers or merchandise between the cities of New York and Philadelphia, or *to compete* in business with the railroad authorized by the act to which this supplement is relative."

The word " or " may be read " and," or may be omitted. The legislature never intended to protect intermediate travel or business.

The act of March 16th, 1854, by its preamble, shows that the design of the act was to protect the company from competition in its *through* business from city to city. This act, on the face of it, is a concession by the companies to the state, which in return granted privileges to the company. By the terms of the act the legislature give construction to prior acts. The company accepted the acts, and thus assented to the legislative construction.

A competing line is a rival line. The defendants' road is not so in any sense. No amount of freight or number of passengers worthy of notice, are carried over it. A line which requires detectives to discover its freight business, and which requires a day and a half to pass from city to city, is not a competing line.

The answer states that troops were carried by order of the secretary of war. This was responsive to the bill. The road is under the control of the secretary of war.

As to the unconstitutionality of the acts under which the complainants claim their exclusive franchise. *Constitution of the U. S., Art.* 1, § 8; *Gibbons* v. *Ogden,* 5 *Peters' Cond. R.* 562; *Ibid.* 566–7. See opinion of Johnson, J., as to the meaning of the word " *Commerce," Ibid.* 589; *City of New York* v. *Miln,* 11 *Peters* 104; Opinion of Story, J., *Ibid.* 154, 58, 61; 7 *How.* 401, 7, 12, 32, 64; *Corfield* v. *Coryell,* 4 *Washington C. C. R.* 378.

The charter of the complainants regulates the intercourse

between the states. It declares, in effect, that no person shall travel or transport goods by way of the Delaware Bay Railroad. If this court restrain passengers or freight from going on that road, will it not be an exercise of the power to regulate commerce between the states? 1 *U. S. Stat. at Large* 686; 2 *Ibid.* 578, 103, *ch. XIII*, 261, § 1, 2; 3 *Ibid.* 405; 4 *Ibid.* 188; *Constitution of U. S., Art. IV*, § 2; 3 *Story's Com.* 673, *ch.* 40, § 1798–9; *Act of Confederation, Art. IV*; *Groves* v. *Slaughter*, 15 *Peters* 515–16; *Livingston* v. *Van Ingin*, 9 *Johns. R.* 526; *Conner* v. *Elliott*, 18 *How.* 591–3; *Corfield* v. *Coryell*, 4 *Wash. C. C. R.* 380.

*Browning*, for the Camden and Atlantic Railroad Company.

The privileges claimed by the complainants were conferred on the joint companies by the act of March, 1832, § 2. On the 19th of March, 1852, the Camden and Atlantic Railroad Company was incorporated with power to make a branch to Batsto. On the 3d of March, 1854, the Raritan and Delaware Bay Company were incorporated with power to construct a railroad from Raritan to Delaware bay. The route prescribed necessarily crosses the track of the Camden and Atlantic Railroad. By the act of March, 1854 (supplement to the joint companies act), their exclusive privileges were extended to 1869, with a declaration in the preamble of what they consisted. This supplement was passed after the incorporation of the defendant companies. If the supplement enlarges the rights of the joint companies, such extension cannot interfere with the corporate rights of the defendants.

In 1862, a connection was about to be formed between the Batsto branch and the Delaware Bay road at Atsion. The complainants' bill was then filed to prevent the junction of the roads. The injunction was denied. In 1863, the supplemental bill was filed to restrain the use of the road, on the ground that the use complained of is a violation of the complainants' exclusive privileges.

Del. & Rar. Canal and C. & A. R. & T. Co. *v.* Del. &. Rar. Bay R. Co. et al.

Upon the motion for the preliminary injunction the court held—

1. That the construction of these roads is no violation of the contract of the state with the complainants.

2. That the connection of the roads at Atsion would be no violation of the contract.

3. That the defendant corporations may lawfully use the connected railway in carrying passengers and merchandise between any points in New Jersey.

No use which confines itself wholly to New Jersey is a competition in business with the complainants within the meaning of that contract. Through business alone is prohibited. This conclusion is fully sustained by authority. All grants to corporations, especially of exclusive privileges, are to be construed strictly, and nothing can be taken by implication. *Bridge Co.* v. *Hoboken L. and I. Co.*, 2 *Beas.* 81, 94. That decree was sustained on appeal.

The complainants, then, can take nothing by implication. If there be a doubt as to the extent of their privileges, they fail in their claim. *Stourbridge Canal* v. *Wheeley*, 2 *Barn. & Adolph.* 792; *Mohawk Bridge Co.* v. *Utica and Schen. R. R. Co.*, 6 *Paige* 564; *Thompson* v. *The N. Y. and Harlem R. Co.*, 3 *Sandf. Ch. R.* 625; *Perrine* v. *the Ches. Canal Co.*, 9 *How.* 192; *Charles River Bridge* v. *Warren Bridge*, 11 *Peters* 546; *Richmond R. Co.* v. *The Lousia R. Co.* 13 *How.* 71.

The case stands now substantially as on the motion for injunction. The business of the defendants has been wholly local. Whatever else has been done has been by others, for which the defendants are in no wise responsible. It has been done either under agreement with the Philadelphia and Eastern Transportation Company, or under arrangement with the ferry company at Camden, or under authority of the secretary of war in carrying soldiers and munitions of war.

What has been done by the Eastern Transportation Company was without the knowledge of the Camden and Atlantic Company, with whom the agreement was made. It was done

in violation of their wishes, and at the earliest possible moment it was prohibited by them; so that there is no call for the interference of this court.

The Eastern Transportation Company are not before the court. No valid decree, therefore, can be made affecting the validity of their contract.

The agreement with the ferry company was made years ago, before the Delaware Bay road was located, and with no reference to the operations of that road. It was made in good faith, and at its date was valid and legal. The only objection is that, when the connected line of railway was made, its operation was unfavorable to the complainants. The railroad company were the mere agents of the ferry company, to receive and pay over the fare of the passengers. At most, it affected only the fare of passengers from, or to Port Monmouth. The contract does not extend to the transportation of passengers from Port Monmouth to New York. The through tickets, which were proved to have been used, were issued by mistake, and were afterwards taken up. The only through business established by the evidence is the carrying of troops and munitions of war. This was done by request, and on the authority, of the secretary of war. The railroad company received their share only for the transit between New York and Baltimore. The answer upon this point is responsive, and must be overcome by evidence. 1 *Cowen* 742; 4 *Paige* 368; 1 *Beas.* 408.

The government, during the civil war, has declared the roads of the country subject to military control. The order to carry soldiers and munitions of war was made upon these companies in connection with others.

Under an act of congress, a general order was made by the president that the railroad companies should be subject to the order of the secretary of war.

An attempt by this court to restrain the use of these roads in accordance with that order, would be a resistance to the government. A refusal by the companies to carry troops and munitions of war would be a resistance to the govern-

Del. & Rar. Canal and C. & A. R. & T. Co. v. Del. & Rar. Bay R. Co. et al.

ment. The defendants were not bound to inquire whether the complainants could do it or not.

Transportation for the government was not a common carrying of goods. *S. & B. R. Co.* v. *L. & N. W. R. Co.*, 17 *Adol. & Ellis* (*N. S.*), 666.

If it be objected that the government had no power to make such order, we answer it was in obedience to the government; and even if it was an usurped power, obedience might have been compelled by armed force.

The Camden and Atlantic company have endeavored to conform to the decision of the court heretofore pronounced. So long as the defendants confine themselves to local business, and enter into no agreement for transportation from city to city, their business is lawful. They have no connection with other companies who are carrying goods, and are not responsible for the conduct of the forwarding merchants. We are simply carriers of their goods over our road. We make no inquiry as to their destination, and are under no obligation to make any. If freight is brought to our depot, with a request to carry and a tender of freight charges, it creates an obligation to carry. If the fare of passengers to Port Monmouth is tendered, they are under no obligation to answer what their destination is. These companies must, by agreement among themselves, be engaged in transportation of freight or passengers from city to city, before the court can lay its hands upon them. *Sandford* v. *Railroad Co.*, 12 *Harris* 378; *Sharpless* v. *Mayor of Philadelphia*, 9 *Harris* 169; 6 *How.* 382.

Neither this court, nor the state, has the power to prohibit the transportation of freight or passengers upon the Delaware river, or Raritan bay. The power belongs to congress. The constitution confers on congress the power to regulate commerce. *Passenger Cases;* Opinion of McLean, J., 7 *How.* 399, 400; Opinion of Wayne, J., *Ibid.* 410–11; Opinion of Taney, J., dissenting, *Ibid.* 464; *State* v. *Wheeling Bridge Co.*, 13 *How.* 430; *Hayes* v. *Pacific Steamship Co.*, 17 *How.* 596.

Every person in the United States has the right to touch on our shores to load and unload. A necessary right for the purposes of commerce, an incident to navigation, can neither be taxed, nor prohibited by the states. As a necessary deduction, all citizens may navigate the Delaware river or Raritan bay, may receive or discharge passengers at Camden or Port Monmouth, without let or hindrance. It is a constitutional right, which can neither be hindered, fettered, or taxed. It is an individual right, pertaining to every citizen of the United States.

If individuals, in prosecution of a lawful commerce, may land passengers or merchandise at Camden or Port Monmouth, these defendants, finding them at these places on the line of their road applying to be carried, have a right to take them up and put them down anywhere along the line of their road. This would be, so far as the defendants are concerned, a local business, within the previous decision of this court.

As to the constitutionality of the act conferring exclusive franchises upon the complainants. *Sedgwick on Statutes* 234; *Const. U. S., Art. IV*, § 2; *Lemon v. The People*, 20 *N. Y. Rep.* 607 ; 3 *Story's Com.* 674, § 1800 ; *Corfield v. Coryell*, 4 *Wash. C. C. R.* 381; 9 *Harris* 169; 12 *Harris* 378; 6 *How.* 382; 2 *Beas.* 84–7 ; *Const. of N. J., Art. IV*, § 1; *Paterson v. The Society*, 4 *Zab.* 395; 9 *Bacon's Abr.*, "*Statutes*" *D;* 1 *Bl. Com.* 90; 4 *Seld.* 491; *Vattel* 31; *Puffendorf, p.* 8, *ch.* 5, § 1; *Domats' Civil Law, Book* 1, *tit.* 6, § 1; *Locke on Gov.* 304–7; 11 *Peters* 466–7; Opinion of Taney, J., *Ibid.* 548; 13 *How.* 71–7 ; 4 *Wheat.* 518; 3 *Cruise's Dig.* (*Greenl. ed.*) "*Franchise*," *tit.* 27, § 29; 27 *Vt.* 140; *Redfield on Railways* 537, § 1, 539, § 3, 4; 2 *Beas.* 84; 10 *Amer. Law Reg.* (1862) 720; 5 *McLean* 148.

*Vroom*, for the Raritan and Delaware Bay Railroad Company.

The court, while protecting the complainants, will not unnecessarily interfere with the defendants. Both parties de-

rive their powers and rights from the same source, and are entitled to equal protection.

The complainants are not satisfied with the prayer of the original bill, and now ask that the defendants' road be abated as a nuisance, mainly on the ground that the conduct of the defendants has been fraudulent.

No such relief will be granted unless specially prayed for. *Story's Eq. Pl.*, § 42–3.

No injunction or *ne exeat* will be granted, unless specifically prayed for. The defendants might then shape their answer and evidence accordingly. Otherwise, they are deprived of this right. *Grimes* v. *French*, 2 *Atk.* 141; *Dormer* v. *Fortescue*, 3 *Ibid.* 124.

It is not the usual province of a court of equity to abate nuisances. Its ordinary remedy is preventive. The abating of nuisances in equity is a recent exercise of jurisdiction. 3 *Mylne & K.* 169.

The usual remedy for public nuisances is by indictment and trial by jury. Private nuisances will, in some cases, be abated. 1 *Johns. Ch. R.* 611; *Gilbert* v. *Wickle*, 4 *Sandf. Ch. R.* 357; 3 *Johns. Ch. R.* 282; 1 *Green's Ch. R.* 57; 1 *Paige* 197; 9 *Ibid.* 575; 2 *Story's Eq.*, § 925–7; 1 *Gall.* 429; 8 *Sim.* 193; 4 *Ibid.* 13; 2 *Atk.* 83; 2 *Anstruther* 603; 10 *Price* 378; 1 *Beas.* 280.

No precedent is found, of any such decree by a court of equity as is now asked for.

An injunction to abate a nuisance can only be granted where the erection *itself* constitutes a nuisance, and not where the injury grows out of the use of the erection.

A wall or dam which is itself a nuisance, will be abated. But where a house is used for offensive purposes, and the *use* only constitutes the injury, the house will not be destroyed to abate the nuisance.

Nor will the nuisance be abated because the defendants' conduct has been fraudulent, or because the court has been deceived or imposed upon. The order will not be made to

operate retro-actively. The jurisdiction of the court is not punitive.

Mr. Vroom further insisted at length upon the points made by Mr. Browning, upon the non-liability of the defendants, and of the unconstitutionality of the acts conferring the exclusive privileges claimed by the complainants.

He further insisted that the act conferring the exclusive franchises was not a contract between the state and the complainants, within the meaning of the constitution. That the Dartmouth College case had carried the doctrine to its utmost length, and that many of the subsequent cases professing to be founded upon it, were not law. That roads and highways were a public necessity, and that the legislature could not deprive itself or its successors, of the power to construct and maintain them.

*Bradley,* for the complainants, in reply.

I shall argue the case as if no decision had been made upon the preliminary motion.

Upon the final hearing, I shall insist we are entitled to an injunction upon facts since developed alone, or upon a review of the whole case, admitting the preliminary injunction was rightfully denied. We cannot have preventive relief, but we may have what is equivalent to it; an abatement of the nuisance by an order—

1. To take up the track. 2. To suppress the lines of communication. 3. To prevent the parties from embarking in business.

The complainants have such a contract with the state as is alleged in pleading, duly accepted by the complainants, and performed by them. The contract is found in the act of March 2d, 1832. The original charters and supplements, with the act in question, together constitute a contract, with various terms and stipulations, between the companies and the state. The act of 1832 is but one of several acts constituting the entire contract. They have all been passed *in pari materia,* and have been fused into one complete and connected whole.

Del. & Rar. Canal and C. & A. R. & T. Co. *v.* Rar. & Del. Bay R. Co. et al.

It is said the act of 1832 is no part of the contract, because it was not a part of the original charter, and was passed after the companies were called into being. It is now, for the first time, insisted that a contract cannot be made with a corporation after it has been incorporated. It was formerly insisted that there could be no contract in the act of incorporation with a party having no legal existence, and without actual consideration. The mere acceptance of the act of 1832, and the construction of the road, is consideration enough. When that act was passed, neither canal nor railroad were finished. A large amount of expenditure was incurred, and all the loans to the companies were solicited and procured, subsequent to and upon the faith of that act. The evidence in the cause clearly establishes that fact.

It is not only the companies in their corporate capacity that are entitled to protection, but the stockholders and bondholders as well.

The assent to the act of 1832, was filed by the stockholders of each company. In pursuance of the provisions of the act, one thousand shares were transferred to the state, and the contract was thus far executed.

That the contract is in form an *enactment*, and not in terms a *contract*, is not material. Similar language has been held to be a contract. *President, &c.,* v. *The Trenton City Bridge Co.,* 2 *Beas.* 46 ; 2 *Gray* 31.

But supposing it is not a contract, but a mere law, the legislature has never repealed it, has assiduously maintained it, and repeatedly recognized it. The state does not ask the court to abate a jot or tittle of the law. So frequently has she affirmed it, that it cannot be taken to be repealed by implication, by the mere grant of the charters of the defendant corporations. It stands on the statute book unrepealed, and will avail for our protection.

But it is a *contract.* What is its scope and extent ? What rights does it secure to the complainants ?

It may be considered as executed and executory ; as *executed*, it is equivalent to a grant of lands or franchises, analo-

2 G *

gous to a grant at common law, of a market or ferry, which to a certain extent was exclusive. The king could not afterwards grant another within that limit.

We were invested with a franchise of all travel between the two cities. The original and subsequent acts all coalesce. It was an effort to subserve the public interest, to supply a great want of civilization. The grant was not only legal but wise.

The company has a right to the business within certain limits on both sides of the road. The contract, in this respect, may be regarded as *executory*.

As to the effect of a grant of a ferry or market. *Charles River Bridge* v. *Warren Bridge,* 7 *Pick.* 144; 11 *Peters* 619, 630, 556, 557.

The act of 1854 has not repealed the contract, nor is it a substitute for it. It denominates the previous acts contracts, but does not recall them. It confirms the act of 1832. That act says it shall not be lawful to *construct* any railroad or roads, &c.; the road is not to be built. Its language is, "which shall be *intended* or used, &c." Intended means *adapted*. That shows the intent. The defendants intended their road to be used for an illegal purpose. When the road is constructed, they say that *ex necessitate* it is subject to public uses.

It is said that " or " may be read " and," and it frequently is so, but why? There must be a reason for it.

The contract is valid. The legislature had power to make it, as well as to grant a ferry or a bridge. The state may take the franchise by right of eminent domain. They may purchase the right.

The crown has immemorially been accustomed to grant ferries or markets. Where is the limit to the power of the legislature to make such grant? It is said there is no such power granted in the constitution. The power of legislation includes it. The power of abrogation does not render the grant void. The legislature, untrammeled by constitutional limits, may enter into contracts. The constitution takes away

Del. & Rar. Canal and C. & A. R. & T. Co. *v.* Rar. & Del. Bay R. Co. et al.

from subsequent legislatures the power of repealing it, but does not limit the power of making it. To enter into such contract does not take away the power of subsequent legislatures. The constitution does that. *Vattel's Law of Nations, Book* 1, *ch.* 21, § 1, 6; *Sedgwick on Constitutional Law,* 625, 628; 9 *Johns. R.* 673–4; 17 *Conn.* 58; 2 *Gray* 32–4; 7 *N. Hamp. R.* 35; 6 *Cranch* 135; *Redfield on Railways* 540.

In the *Charles River Bridge case* the power of the legislature was not questioned. It is difficult to limit the power of the legislature, or to say what it does not include. The objection, that the grant of exclusive franchises ties the hands of future legislatures, applies equally to every grant made by the legislature.

Mr. Bradley also contended that the grant was not unconstitutional, and did not discriminate in favor of the citizens of this state, and against the citizens of other states, and cited *Gibbons* v. *Ogden,* 9 *Wheat.* 203; *Wilson* v. *Blackbird Creek Marsh Co.,* 2 *Peters* 245; *People* v. *The Saratoga R. R. Co.,* 15 *Wend.* 131–6; *Milner* v. *The New Jersey R. Co.,* Justice Grier's opinion in *Newark Bridge case; State* v. *The Wheeling Bridge Co.,* 13 *How.* 518; 2 *Story's Com. on Constitution,* § 1061–4; *Sedgwick on Const. Law* 4; 19 *Wend.* 13, 55; 3 *Zab.* 429; 20 *Barb.* 68; 3 *E. D. Smith* 440, 453.

Counsel reviewed the evidence at length to show, and contended that it established, that the transportation of passengers and freight between New York and Philadelphia is carried on over the connected roads of the defendants, contrary to their disclaimer in that behalf made in their original answers, and that this is done by themselves, or through their aid and co-operation.

The answer alleges that the transportation of soldiers was done by request of the secretary of war. The defendants set up justification under authority of general government. They took order for leave to prove the fact. They were bound to *prove* it. The answer of a corporation under seal is no proof, nor is the answer responsive. 2 *Daniell's Ch. Pr.* 983–4, *note;* 1 *Beas.* 410; 2 *Johns. Ch. R.* 89.

The defendants cannot do by piecemeal, what they cannot do as an entirety. 2 *Gray* 39; 11 *Louisiana R.* 257-8.

The line is competing. It was designed for this very purpose. The amount of business done is not material. *Atkyns* v. *Kinnier,* 4 *Excheq.* 780.

The remedy by injunction to abate the nuisance is the true remedy. It is not affected by the fact that the road is completed. The defendants' acts are an invasion of a clear and ascertained right. They are of constant continuance. A constant succession of actions is required to redress the injury. If acquiesced in, their actions will ripen into a right, will injure the character of our franchise, and render it of less value. The remedy asked is analagous to an injunction to prevent injury to patents for invention and to copyrights. 2 *Story's Eq.,* § 625-30-36-43; 2 *Eden on Inj.* (*Waterman*) 271-5; 4 *Johns. Ch. R.* 160; 9 *Johns. R.* 585-8; 5 *Johns. Ch. R.* 111-12; 1 *Johns. Ch. R.* 615; 17 *Conn.* 65-6. The power of the court to abate the nuisance is clear.

As to the remedy. 2 *Eden on Inj.* 388, *and notes;* *Drewry on Inj.* 260; *Redfield on Railways* 511; 2 *Story's Eq.,* § 727; *Saxton* 157, 518.

As to the prayer of the bill. We ask that the junction of the roads should be prevented. We are entitled to equitable relief conformably to that prayer. 1 *Daniell's Ch. Pr.* 435, note 1; *Story's Eq. Pl.,* § 40-1-2; *Mitford's Pl.* 38-9; *Hill* v. *Beach,* 1 *Beas.* 35; *Rennie* v. *Crombie, Ibid* 457; *Bailey* v. *Burton,* 8 *Wend.* 344; *Wilkin* v. *Wilkin,* 1 *Johns. Ch. R.* 116-17.

The original and supplemental bills constitute a unit. They present but one case. The prayer is broad enough for the relief asked. *Lingan* v. *Henderson,* 1 *Bland's Ch. R.* 236.

THE CHANCELLOR. The complainants, the united Delaware and Raritan Canal and Camden and Amboy Railroad and Transportation Companies, ask to be protected in the en-

joyment of certain franchises and exclusive privileges granted to them by the state of New Jersey. By their original bill, they asked that an injunction should issue to prevent the formation, by the defendants, of a continuous line of conveyance by railroad from the Delaware river to Raritan bay, by a junction of their respective roads, which might be used for the transportation of passengers or merchandise between the cities of New York and Philadelphia, or to compete in business, between the said cities, with the railroads of the complainants, or that might in any manner be used, or intended to be used, for the purpose of defeating the true intent of the contracts made by the state with the complainants, to protect, until the first day of January, 1869, the business of the complainants' railroad from competition between the cities of New York and Philadelphia.

The Camden and Atlantic Railroad Company, one of the corporations which are made defendants, by virtue of their charter, granted on the 17th of March, 1852, have constructed a railroad from the city of Camden through the counties of Camden and Atlantic, a distance of about sixty miles, to the ocean at Absecom inlet, in the county of Atlantic.

The Raritan and Delaware Bay Railroad Company, the other defendant corporation, by virtue of their charter, granted on the third of March, 1854, and of the supplements thereto, were authorized to construct a railroad from some suitable point on Raritan bay, eastward of the village of Keyport, in the county of Monmouth, through the counties of Monmouth, Ocean, Burlington, Atlantic, and Cape May, to Cape Island, on the Atlantic ocean; the general course of the route of the road, as prescribed in the charter, being nearly parallel with the line of the sea coast, and in its direct course crossing the Camden and Atlantic railroad nearly forty miles from Philadelphia. At the time of filing the complainants' bill this road was in the course of construction, and it is alleged in the bill that the company are not constructing their road on the route prescribed by their

charter, but that the road is made to diverge ten miles to the westward of the direct route to May's Landing (one of the points in the prescribed route), to Atsion, near the extreme northwest corner of the county of Atlantic, for the purpose of approaching nearer to the city of Philadelphia, and by means of a connection with the Camden and Atlantic road, formed by a branch road from Atsion to Jackson, forming a continuous and convenient railroad line to Camden, and thereby interfering with the chartered rights of the complainants. It is not suggested that the granting of these charters, or either of them, by the legislature, or that railroads constructed in accordance with the route prescribed in these acts of incorporation, constitute any violation of the contract made by the state with the complainants. But the complaint is that the junction thus illegally attempted to be formed between the roads of the defendants, much nearer to the city of Philadelphia than was contemplated or authorized by their charters, will open a communication by railroad and steamboat between the cities of New York and Philadelphia, which will compete in business with the complainants' railroad, and thereby infringe their chartered rights.

The Camden and Atlantic company, by their answer, alleged that they were authorized to construct a branch road from some convenient point on their main road, to be determined upon by the company, to Batsto, in the county of Burlington; that they located their branch railroad from Jackson station, on the main line of their road, to a point near Atsion (which branch constitutes the connecting link of the two roads of the defendants); that the terminus of the Batsto branch at Jackson is the most convenient and proper point on their railroad from which to make a branch solely for a local road; that it is the most practicable route for the said branch, so far as the topography of the country is concerned; and that the branch was so located because it was supposed that such location will best promote the interest of the stockholders and of the people of the counties through which the road passes, and will best answer the de-

sign of the legislature in authorizing such branch. They admit that an additional reason for thus locating the Batsto branch through Atsion was, that thereby a nearer and more direct communication will be opened between Batsto and the city of New York, and points in the line of the Raritan and Delaware Bay Railroad. They do not admit, nor do they deny, that the controlling reason for that location of the Batsto branch, was to aid the Raritan and Delaware Bay Railroad Company in their purpose of approaching nearer to the city, and by means of a connection with the Camden and Atlantic road, forming a continuous and convenient line to Camden.

The Raritan and Delaware Bay Railroad Company, and the president and other officers of the company, by their answer, among other things, admit that at the time of obtaining from the legislature their act of incorporation, no person interested in the application for said road, had any intention of constructing a railroad to transport passengers or merchandise between the cities of New York and Philadelphia. They admit that the road, as constructed, diverges about ten miles from the direct route to May's Landing, but say that the location by way of Atsion, as at present located, is the most feasible, expedient, and proper location for the railroad contemplated in the act of incorporation, and that the direct route from Squankum to May's Landing was surveyed by direction of the company and found to be impracticable; and that the terminus of the Batsto branch (which forms the connecting link between the two roads) at Jackson, is the most convenient and proper point on the Camden and Atlantic road, from which to make a branch solely for a local road. They deny that any agreement has been made, or is intended to be made, for the transportation of freight or passengers between the cities of New York and Philadelphia. They admit that they and the Camden and Atlantic Railroad Company have in view the construction and perfecting, by means of their respective railroads and a convenient connection between them, of a continuous and convenient line

of railway communication across New Jersey, from the city of Camden to Port Monmouth, but they deny that they or any of them have in view the continuation of said line, at either end thereof, by steamboat transportation to the cities of New York and Philadelphia, for the purpose of using the same for the transportation of passengers or merchandise in a manner which will violate any contract between the state and the complainants, or any provisions of the acts of the legislature referred to in the complainants' bill. They also deny that any contract or arrangement made by them is calculated or intended to form a continuous line of railway communication between the said cities, to compete in business with the business of the complainants, contrary to their vested rights. They admit that it is possible, if not prohibited by law, that a line of communication by railroad and steamboat between the cities of New York and Philadelphia might be opened; but they say that their railroad is not a public highway, and cannot so be used without their concurrence and consent, and as they have made no arrangement whatsoever so to use the same, and do not intend any unlawful use of their road, such use, if unlawful, cannot be made, and if attempted, can be restrained by the courts. They also deny that they intend in any way to violate the chartered rights of the complainants, or that they *intend during their existence, to violate any of the alleged exclusive privileges of the complainants.* And the defendants, all and each of them, declare that it is not and never has been their intention, by the construction of their railroad, or its connections with the Camden and Atlantic railroad, or otherwise, to interfere with the complainants' chartered rights, by competing with the railroad of the complainants by the transportation of passengers or merchandise between the cities of New York and Philadelphia, or otherwise.

The answers having been filed, and affidavits taken touching certain allegations in the answers, the case was heard upon a motion for a preliminary injunction as prayed for in

the bill to restrain the defendants from forming the proposed junction between their respective roads.

The application was denied upon grounds which were briefly assigned at the time of the decision.

On the tenth of June, 1863, the complainants filed their supplemental bill, charging that since the former hearing, the Raritan and Delaware Bay Railroad Company have completed their road from Port Monmouth to Atsion, and in combination with the Camden and Atlantic Railroad Company have completed the branch from Atsion and Jackson, and by means thereof have connected the two roads, so as to form a convenient and continuous line of railway from Camden to Port Monmouth, and have made arrangements, by contract, for continuing the line by means of steamboats between Port Monmouth and New York, and between Camden and Philadelphia, so as to form a complete line of travel and transportation over the said line of railroad between the cities of New York and Philadelphia, and have established lines of transportation, both of freight and passengers, between the said cities by means of said line, and are actually engaged in such transportation, in open and direct violation of the chartered rights and privileges of the complainants.

The defendants have answered; evidence has been taken; and the cause is now to be decided upon final hearing.

The right of an incorporated company to be protected in the enjoyment of their franchises, and the duty of a court of equity, by the exercise of its restraining power, to afford such protection, are familiar doctrines of this court. These principles have been so often declared, and are so constantly recognized in practice, as to render their re-affirmance, or the citation of authorities in their support, an unnecessary formality. They are freely conceded as the recognized law of the court. The power of the court is exercised for the protection of rights, the existence of which is clearly established, and so far only as may be essential for the protection of those rights. The first subject for consideration, therefore,

is the existence and extent of the rights for which protection is asked.

The exclusive privileges claimed by the complainants, depend mainly upon the acts of March 2d, 1832, and of March 16th, 1854. By the second section of the act of 1832, it is enacted, " that it shall not be lawful at any time during the said railroad charter to construct any other railroad or railroads in this state, without the consent of the said companies, which shall be intended or used for the transportation of passengers or merchandise between the cities of New York and Philadelphia, or to compete in business with the railroad authorized by the act' to which this supplement is relative."

By the preamble of the act of 1854, it is recited, that by reason of existing contracts between the state and the companies, as set forth in their acts of incorporation and other acts in relation to the said companies, they are possessed of certain exclusive privileges which prevent the construction, except by their consent, of any other railroad or railroads in this state, which shall be intended or used for the transportation of passengers or merchandise between the cities of New York and Philadelphia, or to compete in business with the railroads of the said companies. And by the first section of the act it is enacted, " that it shall not be lawful, before the 1st day of January, 1869, to construct any other railroad or railroads in this state, without the consent of the said joint companies, which shall be used for the transportation of passengers or merchandise between the cities of New York and Philadelphia, or to compete in business between the said cities with the railroads of the said joint companies, or that may in any manner be used, or intended to be used, for the purpose of defeating the true intent of the act passed March 2d, 1832, or of this act; which intent and meaning are hereby declared to be, fully and effectually to protect, until the 1st day of January, 1869, the business of the said joint companies from railroad competition between the cities of New York and Philadelphia."

It is difficult to conceive of a more express engagement on

the part of the state, or of a clearer recognition of the exclusive rights of the companies than is contained in these statutes.    Whatever doubts may be entertained as to the construction of the contract, there can be none as to the fact of making it.

That the engagement is not in the form of a contract, renders it none the less obligatory.    It is the form in which the faith of the state is usually pledged, and in which contracts with corporations, touching the exercise of exclusive franchises under legislative authority, are entered into.    The same form was adopted in the grant of an exclusive franchise to the proprietors of the bridges over the rivers Passaic and Hackensack, which was recognized as a valid contract on the part of the state, both in this court and in the Court of Appeals.    2 *Beas.* 81, 503.

The grant is founded upon a valuable consideration paid by the companies.

It was made as an inducement to private enterprise and private capital, to construct an important highway, required for public travel and the convenience of commerce, and which it was incumbent upon the state in its sovereign capacity to provide, either directly by its own means, or through the agency of others.

Whether the grant was wise or injudicious; whether the consideration received for it was adequate or inadequate, were questions exclusively for legislative, not judicial cognizance. These considerations cannot affect the existence, or impair the obligation of the contract,

The obligations created by the act of 1832 and by other acts affecting the complainants, were recognized by the legislature in the preamble of the act of 1854, as existing contracts, conferring upon the companies exclusive privileges, which prevented the construction of competing roads, and which privileges could be extinguished only by purchase or by consent.    And by the act of 1854, the legislature not only acknowledge the existence and obligation of the act of 1832, but, with the assent of the companies, they limit its

duration, re-affirm its engagements, and declare its meaning. It would seem that every sanction which the legislature could give to its contract with the companies has been given, and that every guarantee which could be required for the quiet enjoyment of the franchises granted has been furnished. By no act of legislation, has the existence or validity of the contract been called in question. Grave questions have arisen, and different opinions have prevailed, as to the construction and effect of the contract, but so far as is known, its obligation has been by the legislature uniformly acknowledged and respected. . Under such circumstances, it would certainly be a remarkable spectacle if courts of justice, whose peculiar duty it is to maintain the authority of laws and enforce the obligation of contracts, should be found denying the existence and the obligation of a contract which the contracting parties admit, and the binding force of which they acknowledge.

But it is objected that the act of 1832 is null and void, inasmuch as it derogates from the power of subsequent legislatures, upon the familiar principle that acts of parliament, derogatory from the power of subsequent parliaments, bind not. 1 *Black. Com.* 90.

The power of the legislature to make a contract is not denied. It is an inherent attribute of sovereignty. The constitution does not deprive the legislature of the power of contracting, but only of violating its contract. The prohibition is, that "no state shall pass any law impairing the obligation of contracts." Independent of this constitutional provision, any subsequent legislature would have as full power to annul the contract, or to pass a law inconsistent with it, as the legislature had to make it. It is the constitution then, and not the contract, that derogates from the power of subsequent legislatures.

The inability of the legislature to divest itself or its successors of its sovereignty, or to extinguish the trusts committed to its custody for the public welfare, is not questioned. But the legislature not only may, but must determine in what

manner that sovereignty shall be exercised, and how those trusts shall be executed.	It may not strip itself of the power of taxation, but it may, in the legitimate exercise of its powers, exempt the property of corporations or of individuals from taxation for a limited time, and for adequate consideration. So it may not divest itself of the power of furnishing necessary and convenient highways for public accommodation. But whether they shall be constructed directly by state officers, by means furnished from the public treasury, or by the agency of public corporations, townships, cities, or counties, by means raised by taxation, or by the agency of private corporations, by means furnished by private enterprise and capital, secured and stimulated by the hope of reward, is purely a question of legislative discretion.	All these means and agencies of providing highways have been from time to time adopted, without a question as to the right of the legislature to resort to either of them.	In this state great works of internal improvement, requiring large outlays of capital, have been almost universally constructed by private capital and private enterprise, aided in some instances by public bounty.	Bridges, turnpikes, railroads, and canals, have been thus constructed.	It has been neither the disposition of the people, nor the policy of the legislature, to incur the hazards of such enterprises, and experience elsewhere has fully demonstrated that the policy of the state, in this regard, is a wise one.	If these works are entrusted to private enterprise, the inducements held out for their execution must rest in legislative discretion.

The doctrine as attempted to be applied by counsel, carried to its legitimate conclusion, would deprive the legislature of all power of disposing of public property.	The sale of a part of the public domain, in one sense, derogates from the power of future legislatures.	What has once been granted cannot be granted again.	And yet the power of the legislature, as well as of parliament, to alienate the public domain, to convert arms of the sea, where the tide ebbs and flows, into arable land, to the utter destruction of the common

2 H*

rights of navigation and fishing, is well settled, and has been repeatedly exercised. *Gough* v. *Bell*, 2 *Zab.* 457; 3 *Ibid.* 624; *Lowe* v. *Govett*, 3 *Barn. & Ad.* 863; *The King* v. *Montague*, 4 *Barn. & Cr.* 598.

So the legislature may grant the franchise of taking tolls, which are a branch of the prerogative, upon ferries, bridges, or highways. If once granted, the same franchise cannot be granted again. The legislature cannot grant to another the right of taking tolls upon the defendants' road without making compensation. To some extent, the grant of any franchise must in this sense be derogatory of the power of a subsequent legislature. But it is not contended that the legislature has no power of granting the franchise of taking tolls, or of granting any other property which the state may own. This was not contended in the case of *The Charles River Bridge* v. *Warren Bridge*, 11 *Peters* 420; nor did the court so decide. What the majority of the court in that case did decide was, that where there was a grant of the franchise of a ferry without exclusive words, the legislature might lawfully establish another ferry to the detriment of the former. That the grant of the franchise being a public grant, must be construed strictly, and that nothing would pass by implication. Where no *exclusive* privilege was expressly granted, none would be presumed to exist.

The extent of the principle as applicable to this case, fairly stated, is simply this; that the legislature cannot divest itself of the power or the duty of providing necessary highways for public use. And the answer to the objection is, that they have not done so. The legislature have the same control over the franchises and other property of these complainants, that they have over the property of any other cit:-zen. It is subject to the right of eminent domain. By virtue of that right, if the public necessities so require, the exclusive franchises, as well as the other property of these complainants, may be taken and condemned for public use upon making just compensation. *West River Bridge Co.* v. *Dix*, 6 *How.* 529; *Richmond R. R. Co.* v. *Louisa R. R. Co.*,

Del. & Rar. Canal and C. & A. R. & T. Co. v. Rar. & Del. Bay R. Co. et al.

13 *How.* 83; *Enfield Toll Bridge Co.* v. *Hartford & New Haven R. R. Co.*, 17 *Conn.* 40; *Boston & Lowell R. R. Co.* v. *Salem & Lowell R. R. Co.*, 2 *Gray* 1.

The legislature, therefore, have in no proper sense, by the grant of exclusive privileges to the complainants, derogated from the power of subsequent legislatures to furnish highways. The only question is, whether just compensation shall be made to the complainants for their property, or whether it may be taken and appropriated, in disregard of the honor of the state and of the rights of the complainants.

The clause in the act which renders the *consent of the companies necessary* to legalize the construction of any competing road, cannot affect the validity of the law as an act of legislation. If the clause were erased, the legal effect and construction of the contract would remain unchanged. An engagement by a contracting party, that he will not do any act to the prejudice of the other contracting party without his consent, is in effect identical with an absolute and unqualified engagement not to do the act. The party whose interests are affected may consent to the act, and thus waive his rights under the contract. It in no sense confers on these corporations legislative functions, or makes legislation subservient to their views. Their assent is no part of legislation. It does not create the law, but merely avoids the constitutional objection to its validity. It stands upon the same footing with all modifications of private charters. They are valid only when accepted by the corporation whose rights are affected.

The existence and validity of the grant of exclusive privileges by the state to the complainants, which they ask to be protected, are satisfactorily established. But an important question is raised touching the true construction of the contract, and the extent of the exclusive privileges thereby conferred. The complainants claim that by virtue of their contract they are entitled to protection from all competition, not only upon the entire route between the cities of New York and Philadelphia, but from all competition upon any

and every part of the route; the protection extending as well to the way business as the through business between the said cities. The prohibitory clause declares that "it shall not be lawful at any time during the said railroad charter to construct any other railroad or railroads in this state, without the consent of the said companies, which shall be intended or used for the transportation of passengers or merchandise between the cities of New York and Philadelphia, or to compete in business with the railroad authorized by the act to which this supplement is relative." The ambiguity of the enactment is occasioned by the various senses in which the word "between" is appropriately used. It may mean *in the intermediate space*, without regard to distance, or it may mean *extending or passing from city to city*. The prohibition, therefore, may be limited to the through business alone, or it may extend to transportation over any and every portion of the route. But if the design of the enactment had been to exclude all competition, that object would have been effectually attained by prohibiting the construction of any road or roads intended or used to compete with the business of the company. The clause prohibiting the construction of a road for the transportation of passengers and merchandise between the two cities would have been nugatory. But the primary design of the prohibition is indicated by declaring: first, that no road shall be constructed for the transportation of passengers or merchandise between the two cities; and then, in order to guard against any evasion of the prohibition, not to enlarge it, the second clause of the prohibition is added.

That this was the real design of the enactment will appear by reference to previous legislation on the subject. The design of the incorporation of the railroad company is stated in their charter to be, " to perfect an expeditious and complete line of communication from Philadelphia to New York;" and it is made their duty to provide suitable vessels at either extremity of their road for the transportation of passengers and produce "from city to city." The protection afforded to

the company was, that if the state should authorize any other railroad for the transportation of passengers across this state from New York to Philadelphia, which should be constructed and used, and which should commence and terminate within three miles of the commencement and termination of the roads authorized by the act, the transit duty should cease ; and that if any other railroad should be constructed for the transportation of passengers between New York and Philadelphia, it should be liable to a tax not less than the amount payable to the state by this company.

The entire prohibition applies to roads constructed and used for the transportation of passengers across the state, from city to city. The whole protection afforded is to the through passenger business. It is clear that no reference is had to way business, and that no limitation was designed to be placed upon the chartering or construction of local roads.

By the act of 1831, it is enacted that when any railroad or railroads, for the transportation of passengers and property between the cities of New York and Philadelphia, across this state, shall be constructed and used for that purpose, by virtue of any law of this state or of the United States authorizing or recognizing said road, the dividends upon the stock transferred by the company pursuant to the act, should be no longer payable, and the stock should be retransferred to the company. All the protection which the company sought, all that the legislature granted, was to the business from city to city. This was the prize for which these then rival companies were struggling. It was the only object deemed worthy of competition, or worth protecting. But for this the charter would not have been asked, nor the road constructed. It was for this valuable franchise that the consideration was paid by the corporation to the state, and for this that the protection was given.

All these provisions have reference exclusively to the through business from city to city. Yet, on examination, it will be found that they were not effectual for the end designed. In terms they limited the prohibition either to a single road,

or to a road to be constructed within a limited time, or within certain definite limits, or to a road for the transportation of passengers only. They afford protection to a particular line of road. This clearly did not fully attain the object of securing full protection against competition between the cities. The act, therefore, of 1832, which was passed after the union of the railroad and canal companies, applies the prohibition to the construction of any other *railroad or railroads anywhere* in this state, at *any time* during the continuance of the railroad charter, which should be intended or used for the transportation of passengers or merchandise between the cities of New York and Philadelphia, or to compete in business with the railroad of the complainants. The provisions of the acts of 1830, 1831, and 1832, are all in *pari materia*, all form parts of one entire contract, and all have in view the same general object. It cannot be said upon any sound rule of interpretation, that the legislature, by the use of a certain term, confessedly of equivocal import, appropriate to express the intent of the parties as expressed in former acts, and necessary to avoid circumlocution, have essentially enlarged the scope of the enactment and limited the power of legislation.

But how did the parties to the contract understand it?

By the act of 1854, the true intent and meaning of the act of 1832 are declared to be, " fully and effectually to protect, until the first of January, 1869, the business of the said joint companies from railway *competition between the cities of New York and Philadelphia.*"

The plain and natural import of this language, as well as of the act of 1832, is to afford protection against competition in business from city to city. A broader interpretation requires a forced construction to be given to the use of the terms employed. A contract by A that he will not engage in the forwarding or transportation business between the cities of New York and Philadelphia; or that he will not enter into competition with the business of B between those cities, would not be violated in letter or spirit by A's en-

gaging in the transportation of goods between Trenton and Princeton, between Camden and Haddonfield, or between Atsion and Long Branch; unless, indeed, the local business should form one link in a chain of communication reaching from city to city, and should thus be used in violation of the spirit of the contract. The language of the act of 1854 is not the language of the legislature alone, but of the companies also. Like the other acts affecting their corporate rights and privileges, it was formally accepted by the companies. Their assent was given to all its provisions. It expresses their construction of the contract. It is no violent presumption that it was approved, if not framed, by their own counsel. The act was passed more than twenty years after the act of 1832, to which it gives construction, had been in operation. The ambiguity of its phraseology could not have escaped the attention of the companies or their counsel. In 1851, the ambiguity created by the use of the word *"between,"* had been animadverted upon, and its effect, as used in the charter of a railroad company, in a clause similar to that now under discussion, had been treated as a vexed question by the Supreme Court of the United States. *Richmond R. R. Co.* v. *Louisa R. R. Co.*, 13 *How.* 71. They were familiar with the rule of interpretation, that, in a case of doubt, the construction of a grant must be taken most strongly against the corporation.

Under such circumstances, it is a reasonable presumption, that if the intent and meaning of the act of 1832 had been to protect against competition, not only the business between the cities, but between all intermediate places, and over any and every part of the route between the said cities, it would have been unequivocally expressed. That it was not so done, that the ambiguity was not removed when it might have been done with facility, is the strongest evidence that such was not the intention of the contracting parties.

I am of opinion that the grant of exclusive privileges made by the legislature to the complainants, operates to protect only the through business from city to city against competi-

tion. That the companies have the franchise of taking tolls upon any and every part of the route or routes between the cities; but that they have the *exclusive* franchise only in regard to passengers and merchandise transported over the entire route.

But if it be admitted that it is not clear that this is the true construction of the contract, and that its import is doubtful, the construction must still be against the complainants. It is a well settled rule of construction that public grants are to be construed strictly; and in all cases of grants of franchises by the public to a private corporation, the established rule of construction is, that any ambiguity in the terms of the contract must operate against the corporation and in favor of the public. The corporation take nothing that is not clearly given by the act. *Proprietors of Stourbridge Canal* v. *Wheeley,* 2 *Barn. & Ad.* 793; *Beaty* v. *Lessee of Knowler,* 4 *Peters* 168; *Prov. Bank* v. *Billings,* 4 *Peters* 514; *United States* v. *Arredondo,* 6 *Peters* 738; *Charles River Bridge* v. *Warren Bridge,* 11 *Peters* 420; *Richmond R. R. Co.* v. *Louisa R. R. Co.,* 13 *How.* 81; *Proprietors of Bridges* v. *Hoboken Land Co.,* 2 *Beas.* 81.

There is another view of this part of the case which appears to me to be decisive of the rights of these parties, so far as the way business is concerned.

If the grant of exclusive privileges to the companies extend to the way business as well as to the business from city to city, it must, nevertheless, receive a reasonable interpretation. It must be restricted within such limits as may be fairly deemed to have been within the contemplation of the contracting parties, and as shall appear to be in accordance with the reason and spirit of the grant.

It was a principle of the common law, that if one had a ferry by prescription, and another erected a ferry so near it as to draw away its custom, it was a nuisance. The same principle applies to any exclusive privilege created by statute. The grant must be construed so as to give it due effect by excluding contiguous and injurious competition. The com-

peting route for local business must be so near the route of the complainants' road as *materially* to affect or take away its custom.    *Ogden* v. *Gibbons*, 4 *Johns. Ch. R.* 160 ; *Newburgh Turnpike Co.* v. *Miller*, 5 *Ibid.* 112.

If, therefore, the grant could be so construed as to protect the grantees against the construction of any railroad in the immediate vicinity of their route, and against competition in local or way business upon that route, it would not give to the complainants the monopoly of all local business however remote, which, for want of railroad accommodations upon the natural and direct routes of travel and intercourse, might be driven by inconvenient and circuitous routes to seek its destination over the complainants road.    The grant of the exclusive franchise of having a railroad, and of carrying passengers and freight between Camden and Amboy, cannot confer a monopoly of the business between Camden and Manchester, or Toms River.    The local business upon the two roads cannot be regarded as a competing business.

The right of the complainants to be protected in the exclusive enjoyment of their franchise of taking tolls upon their roads for through business being established, are the acts of the defendants in violation of those rights ?

The application for a preliminary injunction to restrain the connection between the defendants' roads, was denied on the 12th of August, 1862.    The junction was formed, and the roads thus united went into operation in September, 1862. The route is continued by means of steamboats between Port Monmouth and New York and between Camden and Philadelphia, which run in connection with the road, so as to form a complete and uninterrupted line of travel and transportation over the roads, between the cities of New York and Philadelphia.    In eleven months, commencing with November, 1862, there were transported over these roads, between Camden and Port Monmouth, and mainly between the cities of New York and Philadelphia, 14,000 tons of freight and 17,600 passengers.    A small portion of the freight consisted of munitions of war, and nearly the whole of the passengers were soldiers, car-

ried over the road for the United States government. The transporting of merchandise from city to city, is carried on by the agency of transportation companies, who have established offices for the reception and delivery of freight in each city, from which offices goods are regularly shipped over the entire route. Daily regular freight lines are thus established. The route is advertised, the attention of merchants and shippers is directed to it as a new and expeditious route, and their patronage solicited. The business of transporting way freight and passengers, is conducted by the railroad companies in their own names. Ordinarily, through tickets are not furnished, and freight is advertised to be carried between Camden and Port Monmouth only. But arrangements are made, and information furnished, which enable passengers to pass from city to city without interruption, and both passengers and through freight reach the cities from the termini of the roads by the same boats which accommodate the way travel, and which are provided by the companies for the accommodation of the regular lines upon their respective roads.

The through freight over the roads has been chiefly transported by the Philadelphia and Eastern Transportation Company, under an agreement bearing date on the 20th of December, 1862, entered into between them and the Raritan and Delaware Bay Railroad Company, by which the railroad company agree to transport over the roads, for the space of ten years, at stipulated rates, all the merchandise and freight of every description delivered to them by the transportation company, and that the entire business of transporting freight over the roads between Camden and Port Monmouth, should be enjoyed and transacted for the benefit of the transportation company, excepting the way freight, the traffic in coal, and the business received from the Pennsylvania Railroad Company, the control of which the railroad company reserve to themselves. The transportation company is constituted the exclusive agent of the railroad company, with power at their expense, to contract for the transportation of freight over the line from Camden to Port Monmouth; and the trans-

portation company agree to exert their utmost influence to procure freight for the line, and to furnish for transportation, over said line of railway exclusively, all the freight of whatsoever kind or description which they may or can receive, control, or influence for transportation, into, through, across, or beyond the state of New Jersey.

By an agreement entered into on the 25th day of October, 1861, between the Camden and Atlantic company and the Raritan and Delaware Bay company, it was, among other things, stipulated that the Camden and Atlantic company should construct without delay the Batsto branch of their railroad. That the Raritan and Delaware Bay company should furnish the means, control the construction, designate the point of termination on their road, and determine the cost of the work. That the Camden and Atlantic company should transport, or allow the Raritan and Delaware Bay company to transport, in connection with their road, all locomotives, cars, passengers, and freight that may be delivered to them by the Raritan and Delaware Bay company, over their road and branches, between the points of intersection and the termini of their road, and should procure staunch and commodious ferry boats to be used at the termini of their road and branches on the Delaware, and convey promptly to and from Philadelphia and the termini of their road at Camden and elsewhere on the Delaware, all such freight, passengers, and cars as the Raritan and Delaware Bay company should require. That the number of trains, the times of running, the rate of speed, the charges for freight, and the rates of fare, should be regulated by the Raritan and Delaware Bay company. That if the Camden and Atlantic company failed to perform any part of their agreement, the Raritan and Delaware Bay company were authorized to perform it at the cost of the defaulting party.

It was further mutually agreed between the contracting parties, that if legal proceedings were instituted, calling in question the right of either or both parties to carry out the contract in whole or part, each party will use every effort

promptly and in good faith to defend itself and each other, will employ the best counsel, and use the utmost diligence to defend itself or themselves, against all claims, suits, or interference; that all suits at law or in equity shall be carried to the court of last resort; and that all expenses of litigation shall be borne by the parties in a designated proportion. That the Camden and Atlantic company would form no connection with any other corporation or individuals, for the conveyance of passengers or merchandise by railroad to or from Raritan bay, nor make any connection with any other intersecting railroad, between the junction of the two railroads and the termini of the Camden and Atlantic company on the Delaware, north of the Atlantic road; and that the Raritan and Delaware Bay company will make no connections with any road or roads that either directly, or by connection, run to the Delaware river, north of Camden; and that the agreement should extend and be binding on the parties, for thirty years from the completion of the Raritan and Delaware Bay Railroad and the branches of the Camden and Atlantic Railroad.

By the supplemental agreement of the 16th of February, 1862, the Camden and Atlantic company agreed that, if the agreement of the 25th of October, 1861, shall not be carried out in good faith, the Raritan and Delaware Bay company shall have a right to take possession of and manage the Camden and Atlantic road, so as effectually to carry out the purpose of that agreement, and they, and such persons as they might substitute, were constituted the attorneys, irrevocable, of the Camden and Atlantic company for that purpose; and they empowered the attorney, or their substitute, to consent to a decree for the specific performance of the agreement, giving to the Raritan and Delaware Bay company, the management and operations of such portion of the Camden and Atlantic road, and of the *ferries* in connection therewith, as might be required for that purpose.

By the agreement of the 20th of December, 1862, between the Raritan and Delaware Bay company and the Philadel-

phia and Eastern Transportation Company, it was stipulated that these agreements between the railroad companies should be held by designated agents, for the benefit of the transportation company, by whose agency the through business over the line is carried on.

The real character and design of these contracts cannot be mistaken. So far as the rights of the complainants are concerned, their character cannot be altered by the fact, that in terms the transportation is limited to the line of the road. Taken in connection with the other evidence in the cause, they are obviously designed to promote the formation of a through route for the transportation of merchandise between the cities of New York and Philadelphia. Neither company has a right to permit its road to be used for such purpose. They cannot effect by combination, what neither can do lawfully. Nor can they effect by the agency of others, what they may not do for themselves. The companies control not only the railroad line across the state, but the boats at either terminus upon the Raritan bay and the Delaware. The Camden and Atlantic company are under stipulation to furnish boats upon the Delaware. The boats upon the Raritan bay are owned in whole or in part by officers of the company, and are used in connection with the regular daily lines upon the road. The evidence shows that arrangements have been entered into, with direct reference to the formation of a continuous line of transportation between the cities of New York and Philadelphia, and that the transportation of freight and passengers from city to city, is carried on over the defendants' roads by their co-operation, with their knowledge, and under and by virtue of agreements entered into between themselves and with others. The fact is clearly established, that the railroads of the defendants are used for the transportation of passengers and merchandise between the cities of New York and Philadelphia, and are competing in that business with the roads of the complainants, in direct violation of the engagement made by the state, and of the rights and privileges of the complainants.

21*

The only remaining inquiry is, to what relief are the complainants entitled?

An injunction is the proper remedy to secure to a party the enjoyment of a statute privilege of which he is in the actual possession, and when his legal title is not put in doubt. *Livingston* v. *Van Ingen*, 9 *Johns. R.* 506; *Croton Turnpike Co.* v. *Ryder*, 1 *Johns. Ch. R.* 615.

And if corporations go beyond the powers which the legislature has given them, and in a mistaken exercise of those powers interfere with the rights of property of others, equity is bound to interfere by injunction, if the exigency of the case require it. *Agar* v. *Regent's Canal Co., Cooper's R.* 77; *River Dun Nav. Co.* v. *North Midland Railway Co.*, 1 *Railway Cas.* 154; *Bonaparte* v. *Camden and Amboy R. R. Co., Baldwin's R.* 231; *Scudder* v. *The Trenton Delaware Falls Co., Saxton* 694.

The complainants' rights are clear and unquestioned. They have been in the actual enjoyment of their franchise for more than thirty years. The defendants, by using, or permitting their roads to be used, for the establishment of a through route for the transportation of freight and passengers between the cities of New York and Philadelphia, have exceeded the powers conferred upon them, and interfered with the rights and the property of the complainants. There is nothing in the charters of the defendant corporations, or of either of them, which expressly, or by implication, confers the power of establishing such route, or the franchise of taking tolls thereon. The legislature cannot be presumed to have intended or contemplated any grant, inconsistent with the manifest design of the charters of the complainants. Whether the complainants' rights have been invaded by a mistake, or a fraudulent exercise of power, is immaterial. In either event, they are entitled to have their rights protected, and the wrong suppressed. The complainants are entitled to an injunction restraining the defendants from using, or permitting to be used, their roads, or either of them, for the

purpose complained of, pursuant to the prayer of the supplemental bill.

The original bill in this cause was filed before the connection between the defendants' roads had been formed, and sought to enjoin the completion of the work. The connection having been formed, and the roads used for an unauthorized purpose, in violation of the complainants' rights, it is now insisted that the roads, as constructed and used, are an existing nuisance, which should be ordered to be abated, and that the defendants should pay to the complainants the damages sustained by their unlawful acts in the premises.

The powers of a court of equity in regard to nuisances, are corrective as well as preventive. It may order them to be abated, as well as restrain them from being erected. *State of Penn.* v. *Wheeling Bridge Co.,* 13 *How.* 519; *Van Bergen* v. *Van Bergen,* 2 *Johns. Ch. R.* 272; *Hammond* v. *Fuller,* 1 *Paige* 197; *Earl* v. *De Hart,* 1 *Beas.* 280; *Washburn on Easements* 578.

In *Earl* v. *De Hart,* Chancellor Williamson said: "There is no reason why the court should not exercise a power to abate, as well as prevent the erection of nuisances, in clear cases." The nuisance in that case was ordered to be abated, and the decree of the Chancellor was affirmed by the unanimous opinion of the Court of Appeals. In the case of *The State of Pennsylvania* v. *The Wheeling Bridge Co.,* 13 *How.* 519, before the Supreme Court of the United States, the bill was filed to enjoin the erection of a nuisance. The bridge was completed after the bill was filed. The court said, the defendants having had notice of an application for an injunction, before the defendants had thrown any obstructions over the river, they cannot claim that their position is strengthened by the completion of the bridge. The bridge was ordered to be abated as a nuisance to the rights of the complainant.

Relief in this form is not asked for, either in the original or supplemental bill. As a general rule, such relief will not

be granted unless made the subject of a special prayer. *Story's Eq. Pl.* 43. But this objection may, perhaps, be regarded as too formal to interfere with substantial equity.

The bill seeks to restrain the defendants from making any connection between their roads, so as to form a continuous line by railroad from the Delaware to the Raritan, which might be used for the purpose of defeating the true intent of the contract made by the state with the complainants; and also to restrain the Raritan and Delaware Bay company from further constructing their road on the line to Atsion, or on any line deviating materially to the west of a direct route from Squankum to May's Landing.

The application is based upon two distinct grounds, *viz.*

1st. Because the divergence of the Raritan and Delaware Bay road to Atsion from the line of the direct route to Cape May, by way of May's Landing, was an unauthorized and fraudulent deviation from the route prescribed by the charter. And 2d. Because the roads, as united, were intended to be used in violation of the complainants' rights, for the transportation of passengers and merchandise between the cities of New York and Philadelphia.

In order to justify the issuing of an injunction to restrain the erection of a nuisance, or to abate it after it is erected, it must appear, not only that the complainants' rights are clear, but that the thing sought to be enjoined is prejudicial to those rights. The fact of the nuisance must be clearly established. *Mohawk Bridge Co.* v. *Utica and Schenec. R. R. Co.*, 6 *Paige* 554. So far as the complainants are concerned, the erection complained of is no nuisance, however unlawful, unless it occasion injury to them. The ground of relief is thus stated by Mr. Justice Baldwin : " If the complainants' rights of property are about to be destroyed without authority of law, or if lawless danger impends over them by persons acting under color of law, when the law gives them no power, or when it is abused, misapplied, exceeded, or not strictly pursued, and the act impending would subject the party com-

mitting it to damages in a court of law for a trespass, a court of equity will enjoin its commission. So of any act of peculiar trespass, occasioning grievous mischief or lasting injury, destructive of property, a right, or franchise." *Bonaparte* v. *Camden and Amboy R. R. Co., Baldwin's R.* 231.

The construction of a railroad over the land of a complainant, without lawful authority, will be enjoined as a nuisance. It is a permanent appropriation of the land of the complainant, and an irreparable injury to his freehold. So if a bridge be erected without lawful authority across a navigable river, to the prejudice of the rights of navigation, the structure itself is a nuisance, and will be abated at the instance of a party injured. But the defendants' roads are not erected upon the lands of the complainants; they do not obstruct their right of way; they destroy no right or franchise of the complainants, which would subject the defendants to damages at law. How, then, do they constitute a nuisance, or entitle the complainants to a remedy by injunction? It is not the structure, but the use of the roads in violation of the complainants' franchise, which creates the nuisance.

The road having been constructed, even if unauthorized, it cannot be abated as a nuisance, as it occasions no injury to the complainants. If there be any room for doubt whether the location of the defendants' road to Atsion is authorized by the charter, an order to abate it would occasion certain loss and injury to the defendants, without any corresponding benefit to the complainants. An injunction to restrain the use of the roads, as prayed for in the complainants' bill, is, under the circumstances, the only appropriate remedy.

Relief in this form is sanctioned by authority and precedent. *Boston and Lowell R. Co.* v. *Salem and Lowell R. Co.*, 2 *Gray* 1; *Pontchartrain R. Co.* v. *New Orleans and Carrollton R. Co.*, 11 *Louisiana An. R.* 253.

The closing of a road used as a highway for travel, by injunction, could only be justified by the clearest necessity.

It will be referred to a master, to take an account of all the through passengers and freight which have been carried

over the road since the opening of the route; and also all damages which the complainants have sustained thereby. In taking the account, the master will include all the soldiers, horses, baggage, and munitions of war that have been transported, distinguishing this part of the account from ordinary business.

No proof has been offered in support of the allegation of the answer, that they were carried over the roads of the defendants by order of the secretary of war, or by orders of the general government. Should it appear before the master that any such orders were made, he will report the evidence thereon, and the disposition of that part of the case will be reserved till the coming in of the report.